## Case No. 8,131.

### LAW v. UNITED STATES.

[Hempst. 338.] [1]

District Court, D. Arkansas. May 8, 1848.

LAND GRANTS—GRANT TO JOHN LAW—TREATY WITH FRANCE—LOUISIANA PURCHASE.

History of the claim, by James H. Piper, acting commissioner of the general land office:

This was a French claim for four leagues square of land, Paris measure, lying on the Arkansas river, in the present state of Arkansas. The petitioner [Jacques Alexandre Bernard Law, Marquis of Lauriston] represents himself as a subject of the king of the French, resident in the city of Paris, France, and as grandson and heir of John Law, "formerly director-general of the Company of the Indies, and controller-general of the finances of the king of France;" that in A. D. 1718, the Company of the Indies, "to whom the former colony of Louisiana, including that which is now the state of Arkansas, belonged, in full property conceded and granted, to the ancestor of the petitioner, the aforesaid John Law, a tract of land of four leagues square, Paris measure, lying on the river Arkansas, in the now state of Arkansas," &c.; that it was granted allodially, "upon certain terms, and conditions therein expressed, the whole of which terms and conditions," the petitioner avers was performed by said law, "in good faith; and if any part of the same was not by him so performed and observed," which is not admitted by petitioner, he avers that the said Law "was prevented from performing the same by the acts, orders, and interference of the king of France, or regent of the said kingdom, or his or their officers or agents," and relieved, etc. "from any further performance of the same;" that from various accidents, &c., "many of the records and documents of the said company of the Indies have been lost and destroyed, so that the original of the grant or concession aforesaid cannot now be found or produced;" that the papers of Law "have also been dispersed and destroyed;" that "petitioner has caused diligent search to be made for the record of the said grant or concession to the said John Law, in various places, namely. in the archives of the Marine, in France, where the records of the colony of Louisiana were kept, and in the land-offices of the states and of the United States, at New Orleans, and in divers other places where it was natural to expect the same might possibly be found,

but without success." The petitioner further avers that, "there was such a grant or concession, that the same was duly and lawfully made," &c., and that he will "prove the nature, contents, and effect of the same, whereof mention is made in the histories of Charlevoix" and others; that Law, in 1719 and 1720, "took possession of the said tract of land by his agents, and settled thereon, fifteen hundred settlers, or other large number, and sent out from France and Germany numbers of others, who died on their passage, and was preparing to send out from L'Orient or some other port or ports in France, a large number of German families, when the same were countermanded and sent back, by order of the regent of France or his officers and agents acting under his authority." The petitioner further avers that the claim, right, and title to which he has succeeded, "is protected and secured by the treaty between the United States and the French republic for the cession of Louisiana; and might have been perfected, and completed, and held good and valid, had the said province of Louisiana continued under the government of France;" that the United States "have sold or otherwise disposed of the whole, or a large part of the said land to various persons," unknown to petitioner, against whom he seeks no relief, "being content to take scrip for the land so disposed of," &c.; that "his claim for the said land has not been submitted to and reported by any of the tribunals constituted by the laws of the United States to decide or report upon land claims, and he prays that the validity of his claim may be inquired into and decided," &c.

In glancing at the history of the events immediately preceding, and about the period of the alleged origin of this claim, we find, that by royal letters patent, dated 14th September, 1712, Louis XIV. granted to Crozat the exclusive commerce of Louisiana with mining privileges (see extract from grant to Crozat, appendix to Clarke's Compilation of Land Laws, p. 944); that in 1717, Crozat's grant was surrendered to the crown (see note to said extract, and Marbois' Louisiana, p. 110); that in August, 1717, during the regency of the Duke of Orleans, in the minority of Louis XV. (Louis XIV. having died in 1715), the Company of the West was created by royal letters patent, in the form of an edict or proclamation, a translation of which is to be found in 1 White, Recep. pp. 641 to 652, inclusive; that by the 5th article of that edict there were granted to said company, "all the lands, coasts, ports, havens, and islands, which compose the province of Louisiana, in the same way and extent as we have granted them to M. Crozat, by our letters patent of 14th September, 1712," &c. It will be observed, that by the 3d article of the said grant to Crozat, mines abandoned three years reverted to the crown; although the 8th article of the edict of 1717

---

[1] [Reported by Samuel H. Hempstead, Esq.]

appears to have conferred on the Company of the West the power also to grant land in freehold. It appears further, that the private bank which John Law had established in Paris, in 1716, under the auspices of the regent, was supplanted in 1718, by the establishment of the Royal Bank (20 Chambers, Gen. Biog. Dict. p. 88; 7 Enc. Am. p. 453); at the head of the affairs of which, Martin states that the "original projector continued," and "availing himself of the thirst for speculation, which its success excited, formed the scheme of a large commercial company, to which it was intended to transfer all the privileges, possessions, and effects of the foreign trading companies that had been incorporated in France." "The Royal Bank was to be attached to it. The regent gave it letters patent, under the style of the Western Company. From the mighty stream that traverses Louisiana, Law's undertaking was called the Mississippi Scheme. The exclusive trade to China and all the East Indies was afterwards granted to the company now called the India Company." 1 Mart. (La.) 234. By a royal edict, in May, 1719, the privileges of the East India and China Company were merged in the Company of the West, and the latter thereafter required to be designated as the Company of the Indies. "Compagnie des Indes." See Receuil des Edicts, &c., Paris, 1720; also, 1 White, Recep. pp. 655, 657. It appears, then, that the "Compagnie D'Occident," in 1717, succeeded to the rights of Crozat, with extended privileges; that it was connected with the Royal Bank; that in 1719 the India China Company was blended with the Compagnie D'Occident, and the latter took the name, in virtue of the royal edict, of Company of the Indies, and that during its existence this claim is alleged to have had its origin. We find it mentioned by Dupratz, who came on to Louisiana with the colony sent in 1718 by the Western Company. In the History of Louisiana (translation published in London, 1774), after referring to the scarcity produced from "the arrival of several grantees all at once," it is stated as follows: "The grants were those of M. Law, who was to have fifteen hundred men, consisting of Germans, provencals, &c., to form the settlement. His land being marked out at the Arkansas, consisted of four leagues square, and was erected into a duchy, with accoutrements for a company of dragoons, and merchandise for more than a million of livres. M. Levans, who was trustee of it, had his chaise to visit the different posts of the grant. But M. Law soon after becoming bankrupt, the company seized on all the effects and merchandise, and but a few of those who engaged in the service of that grant remained at the Arkansas; they were afterwards all dispersed and set at liberty. The Germans, almost to a man, settled eight leagues above, and to the west of the capital. This grant ruined near a thousand persons at L'Orient, before their embarkation, and above two hundred at Biloxi, not to mention those who came out at the same time with me in 1718," &c. Charlevoix the Jesuit, in his "Journal Historique d'un Voyage de l'Amerique" (3d vol. 4to. p. 411), published in Paris in 1744, after referring to the "Kappas," says, in 1721: "Vis-à-vis de leur village on voit les tristes débris de la concession de M. Law, dont la compagnie est restée proprietaire." Law's scheme had failed, and the grant had been entirely neglected. Mart. (La.) p. 248; also, pages 205, 230, 234, 250, 253. The melancholy wreck of the settlement on Law's grant was seen, according to Charlevoix, in 1721, and he then referred to the company as the proprietor of it. Marbois, in his Louisiana, p. 112, expressly informs us, that "the grant was transferred to the company;" and again, in a note on page 120, it is stated that "on the 11th August, 1728, the company surrendered to the king all its rights against John and William Law," that "this proceeding was founded on a judgment in its favor for twenty millions, the value of which had only been furnished in part," and that "the king accepted the surrender the 3d of September following." More than one hundred and twenty-six years have elapsed since the grant had its origin, and no evidence is found that it was ever before officially brought to the notice of our government through any of its tribunals. Indeed the petition declares that the "claim for the said land has not been submitted to and reported by any of the tribunals constituted by the laws of the United States to decide or report upon land claims."

It is averred, however, that the claim, right, and title to which the petitioner succeeded "might have been perfected and completed, and held good and valid, had the said province of Louisiana continued under the government of France." But it will be recollected that France ceded the colony of Louisiana to Spain by a special act, at Fontainebleau, on the 3d November, 1762, the order for delivery given by the king on the 21st of April, 1764 (appendix to L. L. p. 976), the administration remaining in the hands of the French for some time afterwards (Marbois, 137). It may be suggested, then, that if ever it was designed to revive or perfect the claim in question under the French government, there was ample time for it, when it is considered that the sovereignty of the colony continued in the French government between forty and fifty years after the date of the claim. We hear nothing of this claim during the long continuance in Louisiana of the sovereignty of Spain, who parted with her title to the colony by the St. Ildefonso treaty of 1800, ceding it to the French republic, from whom we acquired it by the treaty of 1803. History, then, which tells us of the origin of the grant, informs us also of the failure of

the enterprise of the grantee; of the disastrous events connected with it; of the transfer of the property to the company, whose rights in the premises, and also its privileges, it seems, were surrendered eventually to the king, whose title to Louisiana, in virtue of successive treaties, finally passed to the United States.

The United States, by S. H. Hempstead, district attorney, answered, denying the matters and things alleged in the petition, and demanding full proof; and the petition was dismissed by the court on the 8th day of May, 1848, for want of prosecution.

Richard Henry Wilde, for petitioners.